## COMMONWEALTH vs. BERNARD F. BARAN, JR.

No. 07-P-1096.

Berkshire. February 12, 2008. - May 15, 2009.

Present: Lenk, Duffly, & Green, JJ.

*Rape. Indecent Assault and Battery. Practice, Criminal,* New trial, Assistance of counsel, Discovery, Argument by prosecutor, Indictment, Public trial, Conduct of prosecutor. *Constitutional Law,* Assistance of counsel, Public trial. *Witness,* Child, Credibility, Expert. *Evidence,* Relevancy and materiality, Fresh complaint.

A Superior Court judge did not abuse his discretion in granting a criminal defendant's motion for a new trial, where the judge's findings of fact, which were firmly anchored in the evidence of record, supported a conclusion that the actions of defendant's trial and appellate counsel, taken in the aggregate, constituted ineffective assistance, given trial counsel's apparent failure to engage in any meaningful preparation for the trial of indictments charging the defendant with rape of a child and indecent assault and battery on a child, including his failure to obtain or use the unedited videotapes of interviews of the child complainants (whose credibility was the central issue of the case for both the prosecution and the defense) and his failure to retain or consult with investigators or experts [274-278]; his failure to challenge highly prejudicial testimony by Commonwealth witnesses that impermissibly vouched for the veracity of the child complainants [279-282] or to object to the prosecutor's improper closing argument, which bolstered the credibility of the government's witnesses and encouraged the jury to base their verdict on sympathy for the complainants [282-284]; his failure to seek to exclude evidence of venereal disease and of the defendant's sexual orientation that was both immaterial and highly prejudicial, especially in light of general public opinion in the 1980's, when the trial occurred [284-289]; his failure to protect the defendant from improper fresh complaint evidence or to object to the trial judge's handling of such evidence [289-290]; his inexplicable failure to protect the defendant by not demanding, but instead waiving, indictment as to certain charges [290-292]; and his failure to preserve the defendant's right to a public trial, an issue that appellate counsel failed to raise on direct appeal [292-294].

At the trial of indictments charging rape of a child and indecent assault and battery on a child, the judge's action in closing the courtroom to the press and public during the most crucial phase of the proceedings (i.e., the testimony of the child complainants), without making any findings to indicate what specific harm warranted the closure and without providing interested parties an opportunity to be heard on the question of their exclusion, violated the defendant's constitutional right to a public trial and warranted a new trial. [294-297]

This court declined to remand a criminal case for further evidentiary hearings and findings regarding allegations of prosecutorial misconduct raised in the defendant's motion for a new trial, where such a remand would not serve the interests of judicial economy, given that two other bases raised in the defendant's motion warranted the allowance of a new trial. [297-302]

INDICTMENTS found and returned in the Superior Court Department on November 7, 1984.

COMPLAINTS filed in the Superior Court Department on January 21, 1985.

A motion for a new trial, filed on June 16, 2004, was heard by *Francis R. Fecteau*, J.

*David F. Capeless*, District Attorney, for the Commonwealth.

*Eric Tennen (John G. Swomley & Harvey Silverglate* with him) for the defendant.

LENK, J. The defendant was convicted in 1985 of multiple counts of rape of a child and indecent assault and battery on a child under the age of fourteen. His convictions were affirmed on direct appeal in 1986. Before us is the Commonwealth's appeal from the allowance, in 2006, of the defendant's first motion for new trial. We affirm the order of the motion judge.

I. *Introduction.* In 1984, the then nineteen year old Bernard Baran was working as a teacher's assistant at a preschool day care center in Pittsfield known as the Early Childhood Development Center (ECDC). Over a several week period that October, six children between the ages of two and four (Boy A, Girl B, Boy C, Boy D, Girl E, and Girl F) accused him of molesting them, and he was thereafter charged with six counts each of rape of a child and indecent assault and battery on a child under the age of fourteen. Trial by jury in this notorious case followed within three months; Baran was convicted on January 30, 1985, of three counts of rape of a child and five counts of indecent assault and battery.[1] He was sentenced to concurrent life sentences for each of the rape convictions and to concurrent eight- to ten-year sentences on each of the indecent assault and battery convictions, the latter to be served concurrently with the life sentences.

---

[1]At the close of the Commonwealth's case, a required finding of not guilty entered as to both charges concerning Boy A and as to the rape charge concerning Boy D. The jury convicted the defendant of indecent assault and battery, but not of rape as to Girl F.

At trial, the defendant was represented by a lawyer whom his mother hired for him by mistake: the name of the lawyer she retained resembled that of the criminal defense attorney she set out to hire. In all, Baran's mother paid the lawyer through trial less than a thousand dollars; he did not retain an investigator or experts nor advise that this be done. The defendant was represented on appeal by two lawyers in a prominent local firm. One of them was the attorney whom Baran's mother had originally intended to retain as trial counsel. The other, unbeknownst to her, had only recently stopped representing the family of Girl E in connection with a civil suit against ECDC predicated upon Baran's alleged acts. In the direct appeal, counsel argued only preserved errors. Despite a trial record displaying what Baran's present counsel contends were multiple serious shortcomings on the part of trial counsel, appellate counsel neither raised the matter on direct appeal nor sought a new trial on the ground of the ineffective assistance of counsel. We affirmed the defendant's convictions in a rescript opinion, *Commonwealth* v. *Baran*, 21 Mass. App. Ct. 989 (1986). Further appellate review was denied, 397 Mass. 1103 (1986).

Eighteen years later, in 2004, new counsel brought the defendant's first motion for new trial, doing so after four years of persistent discovery efforts that were precipitated at least in part by the intervening destruction of predecessor trial and appellate counsel's files. Motion counsel accordingly attempted to reconstruct the files and information that were or would have been available to the defendant's trial and appellate counsel and, to that end, sought information and documents from the district attorney and participants in related civil cases.[2] By the time motion counsel became involved in late 2000, other things had changed as well. The trial judge had retired and the trial prosecutor had himself become an associate justice of the Superior Court who frequently sat in Berkshire County, where Baran's trial had been held. Given these circumstances, a Superior Court judge from outside the county was specially designated to handle postconviction discovery and related matters as well as the 2004 motion for new trial.

The postconviction discovery process yielded, among other

---

[2]At least three of the complainants' families (families A, E, and C) brought civil suits against ECDC arising out of the criminal charges against Baran.

things, certain documents and materials that trial counsel had never seen as well as information and documents, not part of the trial record, that were known to but not used by trial counsel. By way of example, among the materials not seen by trial counsel were five lengthy unedited videotapes of interviews conducted by the district attorney's office in October and November, 1984, of children A, B, C, D, and F[3]; the district attorney ultimately turned these videotapes over to motion counsel in September, 2004. Also among the materials unknown to trial counsel were documents generated by police and the Department of Social Services (DSS) concerning contemporaneous accusations made by Boy A and Girl E that they had each been molested by their respective mother's boyfriends; these documents, never produced by the district attorney, were discovered by motion counsel in the civil case files. Among the materials known to but not used by trial counsel, thus not becoming part of the trial record, was a pediatrician's report of her examination of Girl E referencing the prior molestation of Girl E by the mother's boyfriend.

When filed, the motion for new trial, with supporting memoranda, documents, and videotapes, exceeded one thousand pages and rested on four grounds: the trial judge made numerous errors, including the admission of unreliable evidence; there had been multiple instances of prosecutorial misconduct; there was newly discovered evidence; and the defendant had received the ineffective assistance of both trial and appellate counsel. The motion judge also had before him the Commonwealth's written submissions in opposition, ten volumes of trial transcript plus trial exhibits, and the 1985 appellate briefs. In addition, the motion judge heard testimony from six witnesses over five days; he limited that hearing to the issue of ineffective assistance of counsel. Three of the witnesses were attorneys who had been associated with the law firm that served as Baran's appellate counsel and testified as to that firm's representation of Girl E and her mother in a contemplated civil suit against ECDC just prior to taking on Baran's appeal. The defendant testified, as did his mother, and the motion judge heard extensive testimony from child psychologist Dr. Maggie Bruck, a recognized authority in the areas of sug-

---

[3]The videotaped interview of Girl E, which occurred on October 15, 1984, has not been unearthed.

gestibility, memory, and child interviews. The motion judge denied motion counsel's request to call the trial prosecutor as a witness, and defendant's trial counsel was not called by either party, due to his reported state of poor health.

Although four grounds were offered for the motion for new trial and many of the asserted errors readily fall into more than one legal category, the motion judge ordered a new trial solely on the basis of the ineffective assistance rendered by trial and appellate counsel. The motion judge's findings portray a defense attorney who, simply put, was in way over his head. Setting out his findings and rationale in a comprehensive decision entered on June 16, 2006, the motion judge concluded that trial counsel's representation of Baran was gravely deficient in numerous respects both before and during trial and that these fundamental failings likely deprived Baran of an available substantial defense. While some of these deficiencies were apparent from the trial record, yet not raised on direct appeal, the magnitude and metastatic effects of the central deficiency — trial counsel's grievous failure to have investigated and prepared his case — were not apparent from the trial record. Whether considered separately or cumulatively, whether viewed as the ineffective assistance of counsel or as errors creating the substantial risk of a miscarriage of justice, the motion judge determined that "the cumulative weight of these errors" created an overriding uncertainty whether the defendant had received a fair trial; a new trial was accordingly necessary. The defendant was thereafter admitted to bail, having served twenty-two years of his sentence.

On appeal, the Commonwealth contends that the motion judge abused his discretion in ordering a new trial under Mass. R.Crim.P. 30(b), as appearing in 435 Mass. 1501 (2001), maintaining that counsel had not rendered ineffective assistance and that justice had not miscarried. In assessing the Commonwealth's contentions, we are mindful that the motion judge was not the trial judge and that he based his decision in no small part on the documentary trial and appellate record. We are also mindful that, in addition to reviewing the motion exhibits, he heard testimony from six witnesses and that this, too, was interwoven into his decision. Accordingly, we have reviewed the entire record, including the videotaped interviews of the child complainants, and,

while deferring to the motion judge's assessment of the credibility of the witnesses he heard, regard ourselves as being in as good a position as the motion judge to assess the remainder of the record. *Commonwealth* v. *Lykus,* 451 Mass. 310, 325 (2008). Having said this, we are satisfied that the motion judge's findings of fact are firmly anchored in the evidence of record and rely on them as appropriate in what follows.

II. *Background.* The family of Boy A was the first to accuse the defendant of molestation. In mid-September, 1984, either the boy's mother or her then-boyfriend, David, lodged a complaint with ECDC objecting to Baran, a homosexual man, being allowed to care for young children.[4] Mother A had complained about this to her social worker in early August of that year.[5] On October 5, 1984, Boy A's family reported Baran to the police for having touched Boy A's penis, and the next day took the boy for a medical examination; a throat culture tested positive for gonorrhea. The mother of Girl E, a friend of Boy A's mother, was present at the A family's home when Mother A received the call reporting the results of the gonorrhea throat culture.

Girl B's mother, who served on the ECDC board and was herself the apparent victim of a childhood sexual assault, received a telephone call from a friend who worked at ECDC informing her of the A family's allegations against the defendant. She questioned Girl B about the defendant and thereupon contacted

---

[4]The mother's boyfriend, David, was the father of Boy A's younger brother and the cousin of Boy A's biological father; one of the police reports suggests that it was he who telephoned ECDC.

[5]Trial counsel had not pressed for information from ECDC and was also not provided the police report dated October 25, 1984, memorializing a conversation police had with the DSS social worker for the A family. The police report stated:

> "On August 7, 1984, [Boy A's mother] made an accusation [to the social worker] that she knew Bernie Baran was queer by the wa[y] he talks and walks.

> "On August 21, 1984, as the result of this disclosure by [Mother A . . . the social worker] called ECDC . . . and . . . informed [them] of [Mother A's] accusation in regard to Baran being queer."

Although the theory of defense consisted in part of allegations of homophobia, trial counsel was unable successfully to present this theory, having little documentation in hand to support the argument.

police to report her suspicion that the defendant had molested her daughter. After police and a DSS worker interviewed Girl B that evening, the defendant was arrested on October 7, 1984, for indecent assault and battery of Boy A and Girl B.

These accusations were well publicized after October 9, 1984, through local and State media. On October 10, Baran gave rectal, throat, and penile samples for gonorrhea testing; the test results were negative. On October 11, the DSS conducted a puppet show at ECDC designed to inform the children there about the difference between appropriate and inappropriate forms of touching. At about the same time, ECDC sent letters to the parents of children in its care, informing them of the charges against the defendant, and the possibility that their own children might have been abused. Following these events, four additional complainants came forward (Boys C and D, and Girls E and F). On November 7, 1984, the grand jury returned indictments against Baran for rape of a child (five counts) and indecent assault and battery on a child (five counts)[6]; the defendant was arraigned on November 9.

Before they testified at trial three months later, the six children were interviewed many times by various people, including parents, DSS personnel, police officers, a rape crisis center counselor, and prosecutors. Interviews of the children at the district attorney's office in October and November, 1984, were videotaped[7] with the intention of substituting the videotapes for live testimony

---

[6]The counts associated with Boy C were not presented to the grand jury because his mother at the time refused to cooperate with the prosecutor. Her view apparently altered thereafter and the two counts were added by complaint at trial without objection.

[7]Boy A was born on November 6, 1980; his videotaped interview with Jane Satullo, a child psychotherapist and rape crisis counselor, took place on October 7, 1984. Girl B was born on June 4, 1981, and her interview with Satullo was videotaped on October 6, 1984. Boy C, born on June 30, 1980, was interviewed on videotape by DSS investigator Patricia Palumbo on October 18, 1984. Boy D was born July 6, 1980; his videotaped interview with Palumbo took place on October 19, 1984. Girl E was born May 13, 1979; her interview with State Trooper Scott was videotaped on October 15, 1984. Girl F was born on August 14, 1981; her interview with Pittsfield police Detective McGuire was videotaped on November 3, 1984. At some point after these interviews were videotaped, edited versions were created by the district attorney's office and, with the exception of Boy C, shown to the grand jury, which returned indictments on November 7, 1984.

both at the grand jury and at trial, although the children did eventually testify at trial. The grand jury were shown edited versions of the videotaped interviews, containing very small portions of the full videotaped interviews. Trial counsel saw only the edited grand jury versions of the videotapes, and he did not view them until after trial began. The edited grand jury versions omit, among other things, statements in which the children deny that Baran had done anything to them and statements where they accuse others at ECDC both of abuse and of witnessing abuse. The unedited videotapes show the behavior of the children, the extent to which they were distracted and nonresponsive during the interviews, the degree to which their parents participated in the interview process, and the range of interviewing techniques used.

The motion judge found that the defendant did not file any discovery motions.[8] On November 28, 1984, the prosecution filed its certificate of discovery listing the names of thirty-eight prospective witnesses, nine of whom were police officers and three of whom were physicians; confirming the transmission to trial counsel of certain listed police and other reports; disclosing that undescribed "physical evidence in this case" was available for trial counsel's inspection at the police department; and representing that there was no exculpatory evidence other than what might be contained in the materials furnished.[9]

Trial counsel did not file any motions in limine or motions to

---

[8]The Superior Court docket does not reflect the filing of any discovery motions. However, before the defendant was indicted on November 7, 1984, counsel filed a discovery motion in the District Court, which was allowed on November 1, 1984. The motion requested, inter alia:

"3. All written statements, or oral statements reduced to writing or videotapes made by all witnesses and eye witnesses known to the Commonwealth[; and]

". . .

"5. All physical evidence intended to be used by the Commonwealth against the Defendant in his forthcoming trial."

[9]The numbered paragraphs in the Commonwealth's certificate of discovery did not correspond to those in the defendant's District Court motion for discovery. Thus, it is impossible to determine from the record alone whether the unedited videotapes were part of the "physical evidence" provided. The motion judge did not make any findings in this regard, or as to whether the

suppress, and nothing in the record suggests that he ever interviewed any of the Commonwealth's listed witnesses. As of the first day of trial, he had not spoken with several possible defense witnesses, had not decided whether to call a medical expert, and did not have a list of his own witnesses ready for jury voir dire purposes.[10] Until moments before calling her to testify for the defense at trial, trial counsel professed not to have known about or spoken with a witness who corroborated some aspects of Baran's testimony.

Trial counsel filed a motion for a bill of particulars on January 17, 1985, days before trial began on January 21. Along with his motions to sever and to dismiss, the motion for a bill of particulars was heard and denied on January 18, the same day on which the trial judge later conducted a competency hearing of the children.[11]

---

unedited tapes were otherwise made available to trial counsel before or during trial, or whether they were deliberately withheld by the Commonwealth. There is no disagreement that trial counsel never in fact viewed the unedited videotapes; what remains unresolved is why this was so. As already noted, the motion judge limited the evidentiary hearing to the issue of ineffective assistance and did not permit the trial prosecutor to be called as a witness; this, in effect, precluded further exploration of the matter. Although the evidentiary basis for his contention is not obvious from the record on appeal, the district attorney (who was not the trial prosecutor) argued at the 2005 hearing on the motion for new trial that,

> "although [the unedited videotapes] were not provided and apparently not turned over to trial counsel at the time, they were not deliberately withheld . . . [trial counsel] was well aware that he was getting edited videotapes and that, obviously, there were, in fact, the unedited videotapes that he could have. They were made available. They weren't given to him, but he knew of them. They weren't hidden from him at all."

For purposes of ineffective assistance analysis alone, it does not matter whether the Commonwealth made the unedited videotapes available or withheld them. The motion judge found that, had trial counsel "simply viewed the edited tapes seasonably in advance of trial . . . given any degree of perceptivity and thought, such a viewing would have likely suggested that each interview was but a portion of a longer interview." The ordinary fallible lawyer would then have sought the unedited videotapes.

[10]Upon request by trial counsel, however, the judge informed potential jurors during individual voir dire that they would be hearing evidence that might tend to show the defendant was homosexual or had homosexual tendencies and inquired of them whether a witness's homosexuality would cause them to believe the testimony of that witness any more or less, and whether they could be impartial on that basis.

[11]On the morning of January 18, 1985, before the competency hearing of

Trial counsel waived Baran's presence at this hearing and acquiesced in the decision to hold the competency hearing in chambers. The judge found all six children competent to testify.[12]

Trial began on January 21 and continued through the January 31 sentencing. On the first day of trial, the prosecutor filed complaints charging Baran with rape and indecent assault and battery of Boy C. Trial counsel agreed to waive Baran's right to an indictment, stating to the judge that it was "the practical thing to do since you had not severed the trial," and a written waiver of indictment was filed.[13] Trial counsel did not request a

Boy A and the other complainants that would take place later that afternoon, an investigator from DSS interviewed Boy A and his foster mother in connection with a report under G. L. c. 119, § 51A (51A report). Boy A and his younger half-brother had been placed in foster care by the end of October, 1984, and Boy A had recently told his foster mother, apparently spontaneously, that his mother's then-boyfriend, John, had earlier orally raped the boy. (Boy A, who had been diagnosed with gonorrhea of the throat in October, 1984, had not reported in his unedited videotaped interview on October 7 that Baran had orally raped him; nor did he so testify in his subsequent trial testimony.) The investigator knew about Boy A's involvement in the Baran prosecution and spoke at 4:00 P.M. on January 18 about Boy A with fellow DSS investigator Patricia Palumbo; Palumbo told the investigator that Boy A had been "off the wall" at the competency hearing in the judge's chambers and attributed his behavior to overload that day due to the DSS worker's earlier visit. The 51A report concerning Mother A's boyfriend John was substantiated in a January 21, 1985, report under G. L. c. 119, § 51B (51B report). Boy A testified at Baran's trial on January 24, and Patricia Palumbo testified on January 28. The jury returned its verdicts on January 30, the same day the allegations concerning John were referred to the district attorney for prosecution. Baran's trial concluded with sentencing on January 31, 1985. Trial counsel was not informed of Boy A's disclosures about John, the 51A and 51B reports, or the referral for prosecution.

[12]The judge's lingering concerns about the competency of Girl F, the youngest of the children, were alleviated after he and counsel on the first day of trial watched a videotape of the child's November 3, 1984, interview recorded at the district attorney's office. It is not clear from the record which version of the videotape they viewed, edited or unedited. The motion judge found that, while there is a "full" and an edited version of the Girl F videotapes, it remains unclear whether a videotape of the entire interview of Girl F has in fact been found. As he noted, "The longest video currently available to the defendant of [Girl F] is still significantly shorter than the other full interviews and seems to start midway through the interview."

[13]Having been provided at the time by the Commonwealth with only two one-page police reports concerning Boy C, trial counsel, after waiving indictment, requested that the prosecutor provide any other available information as to Boy C. The prosecutor offered to show trial counsel a videotape and later provided only the edited version to trial counsel.

continuance, although fewer than three months had passed since the defendant had been indicted on the other charges. There was no colloquy with Baran to determine whether he knew what rights he was giving up by proceeding on the basis of complaints.

The prosecution called twenty-nine witnesses to testify, including the six children who were then three to four years old, each accompanied to the stand by a parent who testified directly after the child testified[14]; five staff members of ECDC; four police detectives; two DSS investigators; three physicians; and a child psychotherapist.[15] The courtroom was closed to the press and public while the children testified; the trial judge made no particularized findings on the record concerning the need for such closure. The Commonwealth elicited out-of-court statements made by the children from parents, doctors, and various investigators[16]; trial counsel's objections to aspects of such testimony were infrequent and sporadic. Trial counsel did not use any videotapes, edited or unedited, in his cross-examination of the Commonwealth's witnesses, and made sparing use of leading questions or impeachment materials even with adult witnesses for the Commonwealth.

Trial counsel moved, successfully, at the close of the Commonwealth's case for a required finding of not guilty as to the Boy A rape and indecent assault and battery counts, and as to

---

[14]Notwithstanding a motion to sequester witnesses, but absent contemporaneous objection, all children except Boy A were accompanied to the stand by a parent who remained with the child; that parent then took the stand after the child was excused and gave, in essence, fresh complaint testimony. Boy A was accompanied to the stand by his foster mother; his biological mother testified later in the trial.

[15]One of the DSS investigators was Patricia Palumbo, who conducted a puppet show in October, 1984, later conducted videotaped interviews of Boys C and D, and was also present during the closed January 18, 1985, competency hearing of the children in chambers. Two of the three physicians provided fresh complaint as well as expert testimony: Dr. Jean Sheeley, the pediatrician who examined Boy A and Girls B and E, and Dr. Suzanne King, the child psychiatrist who treated Girl B. The third physician, Dr. Jeffrey Ross, was a pathologist who opined as to gonorrhea and its transmission and treatment. The child psychotherapist, Jane Satullo, was employed at the local rape crisis center, and conducted a puppet show as well as the videotaped interviews of Boy A and Girl B in October, 1984.

[16]To the extent that we stated in 1986 that no more than one fresh complaint witness had been permitted to testify as to the content of any one complaint, we were mistaken. *Commonwealth* v. *Baran*, 21 Mass. App. Ct. at 991.

the Boy D rape count; the trial judge also ruled that, with respect to Girl F, the jury could find the defendant guilty of either rape or indecent assault and battery, but not both. By this point, the jury had heard extensive testimony, without objection, from a number of witnesses as to the gonorrhea in Boy A's throat, which the prosecutor had underscored in his opening[17]; none of the other children were so afflicted. Trial counsel did not move for a mistrial at this point; nor did he seek to strike the testimony that supported the Boy A counts. The trial judge instead informed the jury simply that they were no longer to consider the indictments relating to Boy A.

During the defense case, trial counsel called six witnesses, including the defendant, his sister, and a friend. Trial counsel did not consult with or call any experts, either with respect to the testimony of the Commonwealth's experts or to assist him in presenting evidence on the defendant's behalf. The theory of defense, which trial counsel largely failed to develop or implement, was that the defendant had not touched any of the children inappropriately in any way, that he had not had the opportunity to do any of the things he stood accused of doing at ECDC, and that the children's accusations stemmed from the A family's homophobia followed by widespread hysteria, as well as the improperly suggestive ways the children were interviewed.

The jury deliberated four hours before returning guilty verdicts on three counts of rape of a child and five counts of indecent assault and battery.

On direct appeal, appellate counsel argued only preserved errors, claiming that the trial judge erred in denying the defendant's motions to sever and for a bill of particulars; ruling that the child complainants were competent to testify; permitting the prosecutor to ask leading questions of the child complainants; and admitting fresh complaint evidence from sixteen witnesses. We affirmed the convictions in a rescript opinion, discerning neither error nor abuse of discretion as to the errors claimed. In apparent reliance on the record on appeal,[18] we stated, incorrectly as it turns out:

"The defendant had been supplied with . . . copies of

---

[17]See note 40, *infra*. Both trial counsel and the prosecutor argued the point in closing; see note 41, *infra*.

[18]The prosecutor represented to the trial judge in a pretrial hearing on

every police report, witness statement and report of the Department of Social Services in the possession of the prosecution. The prosecutor had offered to make the video-taped interviews of the victims available to the defense."

*Commonwealth* v. *Baran*, 21 Mass. App. Ct. at 990. Further, in discounting the claimed error in the admission of fresh complaint evidence, we thought such evidence particularly relevant given trial counsel's efforts "to insinuate by questioning and argument that the testimony of the victims had been influenced by parents, social workers and members of the prosecution team." *Id.* at 991.

III. *The defendant's motion for new trial.* The defendant claimed in his motion numerous errors by the trial judge,[19] the prosecutor,[20] and his attorneys, relying as well on certain evidence

---

January 18, 1985, that trial counsel "has every witness statement that I have, every police report that I have, every DSS report that I have." He later stated, "Everything I have, he has." In the Commonwealth's "Certificate of Discovery" dated November 28, 1984, the prosecutor stated, "There is no exculpatory evidence other than what may be contained in the materials otherwise furnished."

[19]Motion counsel argued that the judge erred in (a) determining that several of the six child witnesses were competent to testify; (b) admitting various out-of-court statements of the child complainants, their parents, and various investigators, either under the rubric of fresh complaint or as excited utterances, all in violation of Baran's right to confront the witnesses against him; (c) permitting the government, in several instances, to put on multiple fresh complaint witnesses to bolster the testimony of a single complainant; (d) not providing adequate contemporaneous limiting instructions, required by the standards of the time, when fresh complaint evidence was admitted; (e) not preventing the Commonwealth's experts from vouching for the veracity of the child complainants; and (f) closing the courtroom to the public without first having made requisite particularized findings of fact demonstrating the need for so doing.

[20]The defendant charged the prosecutor with having engaged in egregious misconduct, including (a) the failure to disclose exculpatory evidence as required by *Brady* v. *Maryland*, 373 U.S. 83 (1963) (including the unedited videotaped interviews of the child complainants, DSS and police reports tending to indicate that one or more of the complainants had been sexually assaulted by persons other than the defendant, and evidence of bias or motive to lie on the part of one or more of the parents of the complainants, e.g., their homophobic statements and financial interests in potential lawsuits against ECDC); (b) knowingly and intentionally presenting the grand jury with incomplete and misleading evidence; (c) improperly encouraging the child complainants to alter their testimony to favor the Commonwealth's version of the facts; (d) eliciting patently improper hearsay evidence throughout trial; and (e) presenting an improper closing argument that both contained inap-

asserted to be newly discovered.[21] With respect to his claims of ineffective assistance of counsel, the defendant identified numerous significant missteps by his trial and appellate counsel,[22]

propriate appeals to sympathy and vouched for the credibility of the child complainants.

[21]In addition to the unedited videotaped interviews of the child complainants, the defendant's motion referred to certain other information as being newly discovered. Such information includes (a) the recent affidavit of a pediatrician proffering an expert opinion, based on current medical knowledge, that the ruptured condition of the hymen of Girl B, observed and described by Dr. Sheeley in 1984 and 1985 as being consistent with penetration by adult fingers, is instead consistent with normalcy; (b) recantations by three of the six children (two made to therapists within months of the defendant's conviction and one made to high school classmates) and by the boyfriend of Boy A's mother who first reported Baran to the police; and (c) information concerning the sexual abuse history of another of the complainant's mothers. The defendant also claimed as newly discovered the information learned during the posttrial discovery process as to (d) appellate counsel's conflicts of interest, particularly with respect to the firm's representation of Girl E and her family during and after the defendant's trial, but before taking on the defendant's appeal; and, in that context, the fact that, prior to the defendant's trial, the trial prosecutor, without informing defense counsel, shared some portion of his case file on the Baran matter with members of the firm representing Girl E and her family (which, as noted, later represented Baran on direct appeal). See note 24, *infra.*

[22]The defendant faulted trial counsel for failing to conduct any meaningful pretrial discovery or investigation or to master such information as the Commonwealth did make available. Had trial counsel mastered the information made available, had he interviewed the Commonwealth's witnesses and investigated potential defense witnesses, and had he sought out information and material in the Commonwealth's control, motion counsel contended that trial counsel would have discovered the unedited videotapes (if not already made available to him); other instances of abuse (i.e., committed by persons other than the defendant) that might have accounted for age-inappropriate knowledge on the part of the child complainants; widespread use of improperly suggestive interview techniques; exculpatory medical evidence; financial incentives underlying some of the claims of abuse; and multiple sources of bias against the defendant. The defendant also faulted trial counsel's failure to hire any expert witnesses in a case fraught with issues as to which expert testimony might have provided exculpatory evidence, particularly given the Commonwealth's use of multiple expert witnesses. Other claims of ineffective assistance included trial counsel's failure to move for a mistrial once the counts involving Boy A were dismissed; request limiting instructions with respect to a significant volume of fresh complaint testimony; assert the defendant's right to a public trial; attempt to exclude hearsay evidence offered by the complainants' parents and those who interviewed the children; object to the substitution of an undisclosed witness, Dr. King (who treated Girl B and gave expert testimony), or request information about King's credentials and experience, the factual basis for her opinions, and her treatment records as to Girl B;

some of which the motion judge did not address. In allowing the motion for new trial, the motion judge observed that, "[w]hile many alleged errors had their genesis in [trial counsel's] failure to properly investigate and prepare for a significant trial involving notorious allegations of child sexual abuse, the errors did not become manifest until during the trial." The motion judge focused his attention on six areas of what he determined to be significantly defective and damaging performance by counsel: (1) trial counsel's failure to prepare adequately for trial by (a) failing to obtain or use the unedited videotapes, and (b) failing to retain or consult with investigators and experts; (2) trial counsel's failure to (a) challenge testimony by Commonwealth witnesses that vouched for the veracity of the child complainants, or (b) object to the prosecutor's improper closing argument in aid of the same end; (3) trial counsel's failure to seek to exclude immaterial and highly prejudicial evidence, particularly as to gonorrhea; (4) trial counsel's failure to protect the defendant from improper fresh complaint evidence or to object to the trial judge's handling of such evidence; (5) trial counsel's failure to protect the defendant by not demanding, but instead waiving, indictment as to the Boy C charges; and (6) trial counsel's failure to preserve the defendant's right to a public trial as well as appellate counsel's failure to raise this issue on direct appeal.

In directing attention to these errors, all involving either a

move for dismissal of the indictments on the basis of irregularities in the grand jury presentment; and prepare adequately for trial, including reviewing such videotapes as were available to him of pretrial interviews with the child complainants.

As to appellate counsel, the defendant claimed that his attorneys were ineffective insofar as they failed to reveal to the defendant a significant and disabling conflict of interest, i.e., that their firm had previously represented Girl E and her family in a civil suit predicated upon the defendant's alleged acts. Motion counsel maintained that, as a result of this conflict, appellate counsel failed to investigate or use exculpatory evidence relating to other perpetrators of sexual assaults upon Girl E. In this regard, appellate counsel arguably would independently have known from their representation of the E family that in October, 1984, Girl E told her mother and Dr. Sheeley, who both then reported to the police, that Mother E's boyfriend, "Chino," had molested Girl E in the summer of 1984. See note 24, infra. Finally, the defendant asserted that his appellate counsel was ineffective in failing to identify numerous obvious missteps (as outlined above) on the part of his trial counsel.

failure to prepare properly for trial or to protect the defendant properly during trial, the motion judge observed that the credibility of the six children — three or four years old at trial — was "the central issue of the case for both the prosecution and the defense." The only viable defense strategy was to undermine their credibility, but no such defense "was realistically given. No preparations or effort was made to explain to the jury the dangers of multiple interviews, preconceived agenda, or leading questions; nor was there any effort by counsel to uncover and/or demonstrate the inconsistencies between the children's multiple statements." Trial counsel's suggestions, by way of ineffective cross-examination and argument to the jury as to the children's suggestibility, were inadequate to the task. The motion judge observed:

> "[W]hile the case against Mr. Baran was largely one-sided, the evidence was not overwhelming[ly] convincing. The defendant made no admissions nor was there any objective, scientific evidence that linked the defendant to these offenses. None of the day care staff or parents testified to ever having seen him touch a child inappropriately. None of the complaints by the children of sexual abuse came spontaneously but rather only after some questioning or prompting, most by direct questioning and some by leading questions, i.e., where did Bernie touch you. Each parent/witness was permitted to give fresh complaint evidence, as were the civilian and police investigators. Moreover, notwithstanding a sequestration order that had been entered, a parent was able to accompany his or her child to the witness stand and then follow the child to the witness stand shortly thereafter as [a] fresh complaint witness[], without any voir dire or other efforts to limit the[] expected testimony."

A. *Standard of review.* The defendant raised the claim of ineffective assistance of counsel for the first time in this, his first motion for new trial. See *Commonwealth* v. *Zinser*, 446 Mass. 807, 810 (2006), citing *Commonwealth* v. *Saferian*, 366 Mass. 89, 90 n.1 (1974) ("the preferred method for raising a claim of ineffective assistance of counsel is through a motion for new trial"). Of the errors identified by the motion judge as con-

stituting the ineffective assistance of counsel, the most fundamental and pervasive claim is that trial counsel failed to investigate and prepare adequately for trial. We accordingly apply the familiar two-part test for determining whether a new trial may be granted on the basis of attorney error: whether the performance of counsel falls below the standard of an "ordinary fallible lawyer," and whether any misstep deprived the defendant of "an otherwise available, substantial ground of defence." *Commonwealth* v. *Saferian, supra* at 96.[23] We also consider whether there is "some showing that better work might have accomplished something material for the defense." *Commonwealth* v. *Satterfield,* 373 Mass. 109, 115 (1977).[24]

---

[23] The Commonwealth correctly maintains that defense counsel's performance must be judged by the standards of the time — almost twenty-five years ago — when the trial occurred, not by reference to the standards of today. To meet the constitutional requirements of effectiveness, an attorney need not be clairvoyant as to either future shifts in the legal landscape or unforeseen advances in scientific or medical knowledge. See generally *Commonwealth* v. *Amirault,* 424 Mass. 618, 644 (1997). As the court stated in *Commonwealth* v. *Acevedo,* 446 Mass. 435, 442 (2006), quoting from *Commonwealth* v. *Adams,* 374 Mass. 722, 728 (1978), "[a] strategic or tactical decision by counsel will not be considered ineffective assistance unless that decision was 'manifestly unreasonable' *when made*" (emphasis added). See *Commonwealth* v. *Walker,* 443 Mass. 867, 875, cert. denied, 546 U.S. 1021 (2005).

[24] The Commonwealth argued to the motion judge, but does not argue on appeal, that the defendant's claims of ineffective assistance were waived. We note, however, that even if the Commonwealth had continued to argue waiver in its appeal to this court, a finding that counsel on direct appeal had a disabling conflict of interest would, to whatever extent it might matter, see, e.g., *Commonwealth* v. *Peters,* 429 Mass. 22, 31 n.12 (1999), make the waiver rule inapplicable, and *Commonwealth* v. *Saferian, supra,* would supply the standard of review. See, e.g., *Commonwealth* v. *Egardo,* 426 Mass. 48, 49-50 (1997).

Although the motion judge did not make findings as to whether appellate counsel had such a conflict of interest when the law firm undertook to represent Baran in his direct appeal, the record would support such a finding. See *Gossels* v. *Fleet Natl. Bank,* 453 Mass. 366, 368 n.9 (2009). On January 3, 1985, a member of the firm that later represented Baran on direct appeal received from the trial prosecutor, as requested, a copy of search warrant materials in the Baran matter; this was several weeks before the start of Baran's trial and neither Baran nor his trial counsel was copied on the correspondence. By the beginning of February, 1985, an associate at the firm had resigned from the ECDC board due to a conflict arising from her firm's representation of clients contemplating suit against ECDC. Those clients were Girl E and her mother. On behalf of the E family, and following the Baran trial, the same attorney who later wrote Baran's appellate brief requested documents from Dr. Sheeley

As to the remaining claims of ineffective assistance of counsel, the basis for at least some of the asserted claims was counsel's failure to preserve error. We proceed, for the sake of simplicity, by considering whether such errors of counsel gave rise to a substantial risk of a miscarriage of justice. See *Commonwealth* v. *Randolph*, 438 Mass. 290, 293-295 (2002). When analyzing a claim under this standard of review, "[w]e review the evidence and the case as a whole," *Commonwealth* v. *Azar*, 435 Mass. 675, 687 (2002), asking four questions: "(1) Was there error? . . . (2) Was the defendant prejudiced by the error? . . .

and the district attorney concerning Girl E and Mother E, including with his request a signed release by Mother E. The foregoing would support the reasonable inference that appellate counsel began their representation of Girl E before the Baran trial took place, at which both Girl E and Mother E testified, or immediately thereafter, and that appellate counsel received the documents requested from Dr. Sheeley if not also from the district attorney. At a minimum, this would include Dr. Sheeley's notes dated October 13, 1984, referring to Girl E's sexual abuse in the summer of 1984 by "Chino," Mother E's boyfriend. See note 52, *infra*. The identification of a molester other than Baran would be detrimental information in the related matter of a civil suit arising solely out of Baran's conduct.

Appellate counsel began their representation of Baran in May, 1985, by which time they had apparently ceased representation of Girl E and her mother. Appellate counsel did not raise the "Chino" allegation in any respect in their appellate brief on behalf of Baran nor question the financial bias underlying the testimony of Mother E and Girl E; trial counsel had not raised either issue at trial, and neither was part of the trial record. A lawyer from appellate counsel's firm testified before the motion judge that he had no memory as to what was in the file the firm had received from trial counsel. Appellate counsel, however, would nonetheless have independently known about the "Chino" allegation by virtue of their prior representation of Girl E and her mother, but could not use it on Baran's behalf. This suggests a situation of competing loyalties occasioned by the acquisition of privileged information that extant Rules of Professional Conduct proscribed in the absence of a waiver by the client. See S.J.C. Rule 3:07, Canon 4, DR 4-101, as appearing in 382 Mass. 778 (1981), and Canon 5, DR 5-105(A) & (C), as appearing in 382 Mass. 781 (1981). Compare *Commonwealth* v. *Goldman*, 395 Mass. 495, 503-505, cert. denied, 474 U.S. 906 (1985), and cases cited. The appellate lawyer who wrote Baran's brief acknowledged that Baran had not signed a written waiver. While counsel had no memory as to whether he or the other lawyer on the direct appeal had in fact disclosed to Baran the firm's prior representation of Girl E and her mother, he testified that it would have been his practice to do so. Both Baran and his mother, however, whose testimony the motion judge credited in other respects, testified that no such disclosure had been made. Whether regarded as an actual conflict of interest or a potential conflict on the part of appellate counsel resulting in actual prejudice, the foregoing testimony would have permitted either finding.

(3) Considering the error in the context of the entire trial, would it be reasonable to conclude that the error materially influenced the verdict? . . . [and] (4) [Can it be inferred] from the record that counsel's failure to object or raise a claim of error at an earlier date was not a reasonable tactical decision?" *Commonwealth* v. *Randolph, supra* at 298. With these principles in mind, we review the six areas of deficient performance by counsel identified by the motion judge.

B. *Ineffective assistance of counsel.* 1. *Failure to prepare for trial.* The motion judge concluded that foremost among trial counsel's shortcomings in this regard were both his failure to obtain and use the unedited videotapes and his failure to involve experts. The stage was set for this, at least in part, by trial counsel's failure to master the materials the Commonwealth had provided him, most notably, but by no means exclusively, the edited videotaped interviews of the children that the grand jury had seen. Had he looked at these in a timely way — instead of waiting, as he did, until trial was under way — it would have been evident that the edited videotapes were just that, and competent counsel would then have sought the unedited versions.

After viewing all of the videotapes, after reviewing the trial transcript of the children's testimony, and after having heard and credited Dr. Bruck's testimony[25] at the evidentiary motion hearing, the motion judge concluded that the unedited tapes

"[s]tanding alone, without further comment from an expert, . . . would likely have had impact on the jury's consideration of the credibility of the children, and perhaps more significantly on the credibility of the interviewers as well, especially considering their arguably overly-simplistic characterization of their interviews of the children. When seen in conjunction with the leading nature of the direct examination of the children during the trial, it might well have supported the defense claim of suggestiveness by the repetitive manner of the questioning of the children."

[25]The motion judge accepted Dr. Bruck's expertise as relevant after taking into account her professional credentials, experience, affiliations, and extensive record of publications. See, e.g., Ceci & Bruck, Suggestibility of the Child Witness: A Historical Review and Synthesis, 113 Psychol. Bull. 403 (1993); Ceci & Bruck, Jeopardy in the Courtroom: A Scientific Analysis of Children's Testimony (Am. Psychol. Assn. 1995).

Although the utility of then-available expert assistance[26] would have been underscored had trial counsel obtained the unedited videotapes, the desirability of such assistance even absent the unedited videotapes was nonetheless manifest. As the motion judge observed,

> "An expert would have been of assistance to the defendant to explain to the jury why the techniques known to counsel or evident during the trial and used to question the children were harmful. At the very least, an expert could have helped [trial counsel] prepare to cross-examine the Commonwealth's experts who conducted the interviews with the children."

"[E]ven without the unedited videotapes," the motion judge noted,

> "an expert . . . would likely have found evidence in the documents that existed at the time to support testimony that the context and manner in which this case was generated and investigated . . . created problems in the reliability of the interviewing techniques, such as the parents being given suggestions as to how to question their children, the multiple interviews, the leading questions and interviewers with preconceived agenda."

The motion judge credited Dr. Bruck's testimony concerning the many potential problems, recognized as such at the time of trial,[27] in the interviewing of child witnesses, the uncertain reliability of their disclosures when interviewed improperly, and her

---

[26]See *Commonwealth* v. *LeFave*, 430 Mass. 169, 178-181 (1999) (extensive body of medical and psychiatric knowledge available in mid-1980's on subject of patterns of disclosure and truth-telling ability of child victims of sexual assault). See also *State* v. *Michaels*, 264 N.J. Super. 579, 622 (1993), aff'd, 136 N.J. 299 (1994).

[27]In *Commonwealth* v. *LeFave*, *supra*, the court observed that much of what is accepted by experts today about the difficulties inherent in both eliciting and determining the reliability of statements by child victims of sexual assaults was already widely known in the 1980's. Proper and improper interview techniques, and their impact, as identified by Dr. Bruck in the instant matter, were already known by experts at the time of the LeFave trial, i.e., 1986. Examples include "the importance of a neutral interviewer and the need to avoid adult influences to which children are particularly susceptible"; the importance of employing "open-ended rather than leading" or "repetitive

opinion that the unedited videotapes evidenced a number of such problems. But with or without the unedited videotapes, trial counsel's failure to involve an expert manifestly disadvantaged his client. As the motion judge observed, "[W]ithout an expert, the defense had no one capable of explaining to the jury the reasons why children should not be interviewed in the manner they were." Without such expertise, trial counsel did not know how to cross-examine the Commonwealth's witnesses effectively and was "unable to counterbalance the critically important and powerful opinions given by the Commonwealth's experts [Dr. Suzanne King and psychotherapist Jane Satullo] on the truthtelling of child sexual abuse victims." Without such expertise, trial counsel's questions to witnesses and his closing argument about suggestibility fell prey to being dismissed by the prosecutor in his closing argument, and later by this court, as merely untoward "insinuat[ions]."

The Commonwealth contends, however, that trial counsel was not ineffective in these respects. The Commonwealth takes issue, first, with the weight the motion judge placed on the relevance of the videotapes. The most reliable disclosures that children make about sexual abuse, it argues, are their first disclosures, and the videotaped interviews were no more relevant in this regard than the children's subsequent trial testimony. Accordingly, the children's trial testimony adequately demonstrated to the jury their contradictory statements and their hesitancy to accuse Baran of abusing them, arguably making merely cumulative the inconsistencies the jury could have seen on the unedited tapes. Moreover, the Commonwealth argues, the motion judge's reliance on Dr. Bruck's expertise was misplaced insofar as she was not qualified as an expert in child sexual abuse. In any event, the Commonwealth contends, trial counsel effectively raised the issue of the children's suggestibility and the deficiencies in interviewing techniques, having brought them to the attention of the jury through cross-examination and argument; no expert was needed to explain such matters to the jury.

---

questions"; the need to avoid conducting interviews "in an authoritative place"; and the need to avoid use of "anatomically correct dolls" in the interviews. Additionally, references in the interviews to the "statements of a child's peers" are to be avoided because they can "shape the response," and further, it was known then that the "impact of the use of multiple improper interview techniques would be cumulative." *Id.* at 178-179.

These contentions are not persuasive. Like the motion judge, we have viewed the unedited videotaped interviews and reviewed the trial testimony of the children. The latter does not duplicate the former[28]; nor does the trial testimony in any way render the unedited videotapes a less potent tool in the hands of competent counsel. The videotaped interviews were done within weeks of the children's initial disclosures, none of which were spontaneous,[29] and the unedited videotapes contain both denials that the defendant had abused them and allegations that others had; such information was not conveyed to the jury during the children's trial testimony. The unedited videotapes, not seen by the jury or trial counsel, also vividly demonstrate how the children were questioned and would have provided counsel with support for the contention that the children had been coached. It was eminently reasonable for the motion judge to have concluded that Dr. Bruck, whose testimony he credited, had relevant expertise and that appropriate use of the unedited videotapes might have proven a real factor in jury deliberations. So, too, his conclusion was reasonable that the assistance of experts could have rendered cross-examination of certain of the Commonwealth's witnesses more telling, and provided trial counsel with a means of rebutting powerful testimony by the government's experts.

By permitting the Commonwealth to be the sole purveyor of expert medical and psychological evidence to the jury, trial counsel ceded a distinct, if not decisive, advantage to the Commonwealth.[30] The failure of trial counsel to explore these issues

[28]By way of example, Boy C during the unedited videotaped interview states, with his mother present and asking some of the questions, that two different classmates touched Boy C's private parts, that a teacher saw "Bernie" touch Boy C and yelled at the defendant, and that he does not remember the touchings. In contrast, Boy C testified in a considerably more directed way at trial, did not repeat the aforesaid points, and disclosed both that "do" came out of the defendant's penis and that the defendant had put his penis on Boy D's zipper area and mouth. There were significant differences as well between the unedited videotapes and trial testimony of Boy A, Girl B, and Boy D.

[29]Dr. Bruck opined that it is the initial spontaneous disclosure that bears the indicia of superior reliability. An initial disclosure, if evoked other than spontaneously, as here, does not. The Commonwealth offered no contrary expert view.

[30]In view of the testimonial vouching in which the Commonwealth's experts engaged and the admission of expert testimony regarding gonorrhea, both as discussed *infra*, the failure to provide countervailing expert viewpoints was particularly damaging to the defendant's case.

through better pretrial preparation,[31] including the hiring of investigators and experts, effectively deprived the defendant of not merely a "substantial ground of defence," *Commonwealth v. Saferian*, 366 Mass. at 96, but perhaps his only possible defense. These omissions, standing alone, would justify affirming the motion judge's order.[32] See *Commonwealth v. Haggerty*, 400 Mass. 437, 442 (1987), and cases cited ("[f]ailure to investigate the only defense a defendant has, if facts known to or with minimal diligence accessible to counsel support that defense, falls beneath the level of competency expected"); *Commonwealth v. Garcia*, 66 Mass. App. Ct. 167 (2006). See also *Commonwealth v. Caban*, 48 Mass. App. Ct. 179, 182-183 (1999). Compare *Commonwealth v. Conley*, 43 Mass. App. Ct. 385, 395 (1997) (defense counsel's failure to employ forensic expert for purpose of developing primary defense theory "manifestly unreasonable").

---

[31]Also, with adequate pretrial preparation, trial counsel could have highlighted for the jury the potential motives — financial and otherwise — to suborn false testimony on the part of some of the complainants' parents, and the possibility that one or more of the complainants might have been sexually abused by persons other than the defendant. As to the former, for example, trial counsel failed to uncover a letter dated October 23, 1984, from the lawyer for Boy C's family to ECDC contemplating a civil lawsuit. The latter type of information, if pursued, could have been used both to explain any age-inappropriate sexual knowledge evidenced by the complainants and to counter the prosecutor's emphasis in his closing that the child complainants should be believed because "a child of such tender years simply does not have the cognitive ability to make up or fabricate a story about sexual abuse . . . three and four year old children simply wouldn't talk about these types of things unless they really happened." For example, the fact that Girl E appears to have acknowledged that acts ascribed to the defendant were congruent with those committed by her mother's boyfriend would have provided strong potential basis for cross-examination. In this regard, we note the motion judge's finding that trial counsel had been placed on notice of the possible existence of police and DSS records relating to other instances of sexual abuse involving Girl E. Specifically, the judge found that medical notes prepared by Dr. Jean Sheeley, the pediatrician who examined Girl E in October, 1984, were turned over to trial counsel. The notes contain Girl E's disclosure to the doctor that her mother's boyfriend had earlier done the "same thing" to her in a West Springfield motel. See note 52, *infra*. Although the nonproduction of other materials to trial counsel concerning Girl E and Boy A (see *ibid*. and note 11, *supra*) likely contravened *Brady v. Maryland, supra*, trial counsel was also ineffective in not seeking out further information at least as to Girl E on his own initiative.

[32]We ultimately need not reach this question in view of the other significant missteps by defense counsel, discussed *infra*.

2. *Vouching for the complainants' veracity.* (a) *Failure to object to experts' vouching.* At the time of trial, it was well-settled that, as a general matter, vouching for the credibility of witnesses was improper. See, e.g., *Commonwealth* v. *Villalobos*, 7 Mass. App. Ct. 905, 905-906 (1979). As the court stated in *Commonwealth* v. *Francis*, 390 Mass. 89, 100-101 (1983), "[w]e look to the jury after an adversary trial to make the decision as to what testimony to believe." With respect to expert testimony in sexual assault cases, the general rule was that an expert witness could not indicate that she "believed the victim had been raped and had not fantasized or invented the rape." *Terrio* v. *McDonough*, 16 Mass. App. Ct. 163, 176 (1983).

We note, however, that in the specific context of child sexual abuse, experts were accorded broader latitude, at least at the time this case was tried. See *Commonwealth* v. *Brown*, 26 Mass. App. Ct. 987, 987 (1988). This relaxed standard notwithstanding, it was nonetheless not permissible at the time of trial for an expert to opine directly on the credibility of a witness, see, e.g., *Simon* v. *Solomon*, 385 Mass. 91, 105 (1982), including child witnesses in sexual assault cases.

Thus, in *Commonwealth* v. *Ianello*, 401 Mass. 197 (1987), also tried in 1985, the court concluded that the question whether children, as a class, are likely to fabricate allegations of sexual abuse was not a proper subject for expert testimony. *Id.* at 201-202. Such testimony, the court determined, "impermissibly intrude[s] upon the vital function of the jury." *Id.* at 202. See *ibid.*, citing *United States* v. *Azure*, 801 F.2d 336, 341 (8th Cir. 1986) (court abused discretion in permitting a doctor to opine on the credibility of an alleged child victim of sexual abuse). "Evaluations of credibility are, of course, within the exclusive province of the [jury]." *Commonwealth* v. *Bohannon*, 376 Mass. 90, 94 (1978).

Judged by the foregoing standards, there were multiple occurrences of impermissible testimonial vouching on the part of witnesses for the Commonwealth. Psychotherapist Jane Satullo, for example, was permitted to testify, without objection or contradiction by any other expert, that children of the age of the children here "in order to repeat a story and to tell the details again, the same[,] it needs to be a true story." At another point, the same

witness opined that "any child who is able to tell a story and repeat its details over a period of time then there is validity to that story." Later, during cross-examination, Satullo stated that "children have withheld the name of the person [who sexually assaulted them] out of fear but there haven't been any cases of young children falsely accusing somebody." None of these statements drew any objection from defense counsel, despite their obvious infirmity.[33]

Similarly, the treating psychiatrist for Girl B, Dr. Suzanne King, was permitted to testify that Girl B was too young to be "able to describe in graphic detail some sexual event unless she actually experienced it," and that the child's "emotional overlay is not something that she could make up." Finally, the witness was permitted to state both that "a child of that age is not really at a stage where they can talk about something that they haven't experienced . . . ," and that "[w]hat she says actually occurred in terms of being sexually abused." Again, none of this testimony drew objections from trial counsel.[34]

The admission of this evidence was improper and plainly prejudicial. Even the trial judge, during a side bar conference, expressed his belief that portions of the expert testimony were problematic.[35] This warning from the judge, however, did not result in any apparent increased vigilance by trial counsel. The motion judge concluded — and we agree — that the failure to lodge timely objections to the many instances of such improper

---

[33]Although even the edited videotapes contained some inconsistencies in the testimony of the complainants, trial counsel did not use them to undermine Satullo's testimony regarding the veracity of the children's testimony concerning sexual abuse.

[34]Dr. King's name did not appear on the Commonwealth's witness list, yet trial counsel made no effort to have her testimony excluded. Nor did trial counsel make any serious effort to challenge the foundation underlying King's expert opinions or her qualifications for offering same, having not even requested copies of her treatment records for Girl B.

[35]With respect to Satullo's statement that it would be "impossible" for a child to repeat a false story consistently, the judge stated at side bar that the testimony "could be misunderstood by the jurors." The judge thereafter instructed the jury, as to Satullo specifically, that an expert "would not have been permitted and did not refer to the specific testimony of certain witnesses in this case . . . [and that] whether anyone is telling you the truth in a trial on the witness stand is exclusively the province of jurors." He did not instruct similarly with respect to Dr. King's opinion on the subject.

vouching resulted in the jury being exposed to significant improper testimony — testimony that may well have tipped the balance in the Commonwealth's favor on the crucial question of the complainants' credibility. This is particularly so absent the children's unedited videotaped interviews or countervailing expert testimony. In these circumstances, trial counsel's inaction amounted to error.[36]

Although the Commonwealth disputes the characterization of the experts' testimony as vouching, it contends that such testimony did not in any event give rise to a substantial risk of a miscarriage of justice because the government's case did not rest solely on the children's credibility. Here, the Commonwealth points to evidence that Baran was the only male staffer at ECDC and the only one named Bernie (the name to which the children frequently referred as their abuser), that he had opportunity to be alone with children A through F, that Girl B's hymenal injury was consistent with penetration by adult fingers,[37] that several children exhibited behaviors consistent with abuse, and that the testimony of Boys C and D corroborated each other as to Baran being their abuser.[38] The question before us is not the sufficiency of the evidence, however. As the motion judge observed, although the evidence presented at trial was one-sided, it was hardly overwhelming, the aforesaid evidence notwithstanding. To be sure, while the Commonwealth's case did not rest solely on the children's credibility, it rested very largely upon it and upon the credibility of the Commonwealth's witnesses who gave percipient, fresh complaint, and expert testimony. Trial counsel's failure to object to vouching — particularly when seen as one of multiple lapses by counsel — was error resulting in a substantial risk of a

[36]In the case of both King's and Satullo's testimony, the prejudicial impact of the vouching was compounded by the fact that these witnesses were both percipient and expert witnesses; King had treated one of the complainants, and Satullo had interviewed two of the children.

[37]In addition to examining Girl B on October 8, 1984, and generating medical notes that the prosecutor turned over to trial counsel, Dr. Sheeley also did a more extensive gynecological examination of Girl B on January 16, 1985, right before trial and unbeknownst to trial counsel. When trial counsel, with the earlier medical notes in hand, attempted to cross-examine Sheeley as to her opinion that Girl B had suffered a full rupture of her hymen consistent with full penetration, he learned for the first time and to his client's disadvantage of the recent examination.

[38]Indeed, the latter point itself turns on the credibility accorded the minimalist testimony of Boys C and D.

miscarriage of justice; it prejudiced Baran, likely influenced the verdict materially, and was not a reasonable tactical decision.

(b) *Failure to object to improper closing argument.* The motion judge concluded that the prosecutor's closing argument contained numerous defects, none of which drew an objection from trial counsel. In the first instance, the argument contained elements designed to bolster improperly the credibility of the government's witnesses. See *Commonwealth* v. *Wilson*, 427 Mass. 336, 352 (1998) (describing general proscription against prosecutorial vouching). For example, the prosecutor expressed his view that the parents, who had endured a "terrible nightmare," would never permit their traumatized children "to come to court and testify before sixteen jurors about the horrible bloodcurdling things that these little children" revealed unless the allegations were true. See *Commonwealth* v. *Beaudry*, 445 Mass. 577, 586-587 (2005); *Commonwealth* v. *Lorette*, 37 Mass. App. Ct. 736, 742 (1994), *S.C.*, 422 Mass. 1014 (1996); *Commonwealth* v. *Ramos*, 73 Mass. App. Ct. 824 (2009). The prosecutor continued, "And furthermore, even if they would, they couldn't. Maybe one parent . . . could brainwash a child . . . [b]ut [not] five." There were no factual bases in the trial record for such statements. See *Commonwealth* v. *McCoy*, 59 Mass. App. Ct. 284, 292 (2003). The cumulative effect of such statements was to vouch for the credibility of the complainants. See *Commonwealth* v. *Sanders*, 451 Mass. 290, 296-297 (2008) (prosecutor may not express personal belief in veracity of witnesses or rely on extrajudicial evidence in attesting to their credibility). These errors were particularly toxic in view of the testimonial vouching, outlined above, that pervaded the Commonwealth's case-in-chief. Having failed to object to the testimonial vouching for reasons that have no evident tactical basis, trial counsel was equally complacent about these closing remarks by the prosecutor, none of which occasioned any objection.

The prosecutor's closing also contained a number of passages apparently designed to inflame the jurors' passions. See *Commonwealth* v. *Vazquez*, 65 Mass. App. Ct. 305, 312 (2005), quoting from Lawless, Prosecutorial Misconduct § 9.21 (3d ed. 2003) ("Arguments aimed at arousing the passions or sympathies of the jury are the paradigm example of prosecutorial misconduct

during closing argument. Such arguments distract juries from their true fact-finding function and are highly improper"). See also *Commonwealth* v. *Fitzgerald*, 376 Mass. 402, 424 (1978); *Commonwealth* v. *Mahdi*, 388 Mass. 679, 693 (1983). The prosecutor began his closing by exhorting the jury to return a guilty verdict "in the name of justice and decency." He went on to state that,

> "[if] ever there was a case where the ends of justice literally cry out for a guilty verdict, this is that case . . . because truth is the mother of justice and in this case truth came literally from the mouths of babes."

At another point, the prosecutor stated that, "[w]ith the chances [the defendant] had[,] he could have raped and sodomized and abused those children whenever he felt the primitive urge to satisfy his sexual appetite." The defendant, according to the prosecutor, "was like a chocoholic in a candy store, and indeed, for him perpetrating these despicable acts was like taking candy from a baby." The prosecutor concluded his closing with the admonition:

> "I don't win or lose cases. The only ones who win are the people of the Commonwealth of Massachusetts who win when justice is done. And the only ones who lose are the people of the Commonwealth of Massachusetts who lose when justice is thwarted. . . . I beseech you — I beg you — think of those children and bring back a verdict of guilty on each and every one of these charges.

> "I can sit down now, knowing the fate of the people of the Commonwealth of Massachusetts in th[is] case . . . is in good hands."

Not only did the prosecutor improperly encourage the jury to determine the verdict on the basis of sympathy for the complainants, see *Commonwealth* v. *Santiago*, 425 Mass. 491, 494-495 (1997) (appeals to sympathy for victim in closing provides basis for reversal), but he also indicated that the jury would be answerable to the public should they elect to return a not guilty verdict, a result that the prosecutor implied would amount to a "thwart[ing]" of justice. See *Commonwealth* v. *Mathews*, 31

Mass. App. Ct. 564, 572-573 (1991), cert. denied sub nom. *Matthews* v. *Rakiey*, 504 U.S. 922 (1992) (reversible error for prosecutor to imply that jurors, in deciding verdict, are answerable to community). As with the foregoing instances of vouching, none of these statements was met by any objection from defense counsel.

Through what the motion judge generally described as trial counsel's "lack of . . . attention," the prosecutor was permitted, in his closing, to undermine the defendant's case through improper means. The cumulative effect of the government's presentation, see *Commonwealth* v. *Smith*, 387 Mass. 900, 911-912 (1983) (cumulative effect of inflammatory and misleading remarks requires reversal), was likely to "sweep jurors beyond a fair and calm consideration of the evidence." *Commonwealth* v. *Perry*, 254 Mass. 520, 531 (1926). Trial counsel's failure to safeguard the defendant's interests by obtaining a curative charge or, at a minimum, by preserving these points for review cannot be viewed as a reasonable tactical decision. Trial counsel's errors with respect to vouching in the evidence admitted and argument made gave rise to a substantial risk of a miscarriage of justice.

3. *Failure to exclude prejudicial evidence.* Among the many ways that trial counsel failed to protect his client, the motion judge found particular fault with counsel's treatment of certain irrelevant and highly prejudicial evidence. This evidence, which counsel never tried to exclude, concerned both Boy A's gonorrhea of the throat and the defendant's sexual orientation. The motion judge concluded that "[n]o reasonable trial strategy can justify counsel's failure to object to the gonorrhea evidence from the outset." Compare *Commonwealth* v. *Kirkpatrick*, 423 Mass. 436, 447-448, cert. denied, 519 U.S. 1015 (1996). Cf. *Commonwealth* v. *Choeurn*, 446 Mass. 510, 521 (2006). He reached the same conclusion as to the subject of Baran's homosexuality, which was first introduced by trial counsel. Since Baran's sexual orientation had no relevance to the charged crimes, the prosecutor could not have offered such evidence himself. See *Commonwealth* v. *Capone*, 39 Mass. App. Ct. 606, 611 (1996).

The government offered no evidence permitting even the inference that Boy A had been forced to submit to oral sex by

Baran, nor was there any evidence that Baran had gonorrhea at any relevant time. Yet, notwithstanding defense counsel's inability to identify for the jury another source of Boy A's infection,[39] and knowing that he had no experts of his own, trial counsel nonetheless offered no objection to the Commonwealth's opening,[40] which should have alerted him to the likely consequences of his strategy. Nor did he then object to the Commonwealth's disturbing evidence that gonorrhea had been found in Boy A's throat or the medical evidence the government presented regarding the ease and speed with which gonorrhea can be cured and its greater frequency in the population of homosexual men. Finally, notwithstanding the unexpected opportunity to recover from these trial errors afforded by the allowance of his

---

[39]As noted elsewhere (see note 11, *supra*), there was evidence that Boy A had been orally raped by his mother's boyfriend in the same time frame in which the alleged attacks by the defendant occurred, but such evidence was not disclosed to defense counsel by the Commonwealth.

[40]In his opening, the prosecutor stated:

> "Dr. Sheeley will . . . tell you that she took some cultures from [Boy A]'s rectum and from [his] mouth and you'll hear that the culture taken from [his] throat was chemically analyzed and [it] was found that little [Boy A], four years of age, had gonorrhea in his throat.

> ". . .

> "Finally, you will hear that as part of the investigation the Pittsfield Police Department obtained a warrant authorizing them to take Mr. Baran to the Berkshire Medical Center for purposes of determining if he had gonorrhea. That was done on October 10, 1984, six days after the first case came to light. You'll hear the test results were negative. On October 10th of '84, Bernard Baran did not have gonorrhea, there's no dispute about that. But, you'll hear something else, ladies and gentlemen.

> "You'll hear from a doctor named Jeffrey S. Ross that gonorrhea is the kind of disease that can be cured relatively easily and very quickly; that with proper medication it could be eradicated and cleared up in a matter of days, in some cases virtually overnight. You'll hear how gonorrhea is spread. It's possible for a person who has gonorrhea to give it to one sex partner and not to another depending on the type of contacts and a number of other factors.

> "So, because [Boy A] had gonorrhea in his throat and because no other child, thank God, had gonorrhea, I ask you to listen carefully to that evidence because you might find it to be very important and that, in a nutshell, is what the Commonwealth will attempt to prove during the course of this trial."

motion to dismiss the counts as to Boy A, trial counsel did not move for a mistrial or to strike all the gonorrhea evidence once the counts relating to Boy A were dismissed at the close of the Commonwealth's case. To the contrary, trial counsel pressed on, inexplicably having Baran acknowledge during the defense case that he had previously been infected with a venereal disease, and later arguing the gonorrhea evidence in closing.

On appeal, the Commonwealth does not contend that the evidence of sexual orientation or gonorrhea was relevant to establishing Baran's guilt. Instead, it takes the position that such evidence was of value to the defendant, allowing trial counsel to argue in closing that because Boy A was, but Baran was not, infected with gonorrhea at the time of Baran's arrest, Baran could not have assaulted Boy A or, by extension, the other children. Further, the Commonwealth argues, trial counsel could pursue the defense that homophobic bias and hysteria accounted for the accusations leveled against Baran. On this view, trial counsel followed a reasonable defense strategy and made effective use of the Commonwealth's evidence.

That trial counsel's strategy in this regard was manifestly unreasonable, however, can perhaps most simply be shown by the trial prosecutor's devastating closing remarks, reproduced below,[41] which left that ill-conceived strategy in ruins. This was an entirely predictable result given the admission of evidence

[41]Notwithstanding the fact that there had been no testimony at trial that Baran had orally raped Boy A, and, in any event, a required finding as to all the charges concerning Boy A had entered at the close of the Commonwealth's case, defense counsel and the prosecutor continued to focus on the facts surrounding Boy A right through the closing arguments.

The prosecutor argued, "[Trial counsel] says: 'No, it can't be. It can't be. [Boy A] had gonorrhea in his mouth and Bernard Baran didn't have gonorrhea.' Well, in the first place you heard Dr. Sheeley and Dr. Ross say that it is entirely possible for a person who has gonorrhea to give it to one sex partner and not to another. It depends upon the type of contact for one thing. A person who has gonorrhea on his penis is not going to give it to a child by putting his finger into the child's private area. It's not going to be spread that way.

"You heard the doctors say that gonorrhea is the kind of disease that can be cured very easily and quickly. With the proper treatment it takes twelve to twenty-four hours, sometimes forty-eight hours. Bernard Baran did not have gonorrhea on October 10th, but that doesn't mean he didn't have it when he raped these children. Remember he was bailed out on October 7th at 2:00 P.M. He was tested three days later on October 10th after 7:00 P.M. If he had it don't you think the first thing he would have done upon being bailed out is to

that the Commonwealth had promised in its opening, coupled with trial counsel's failure to present countervailing medical testimony rebutting the Commonwealth's expert, along with his decision to introduce his client's homosexuality and prior exposure to venereal disease. We agree with the motion judge's assessment that "this was a risk-laden strategy that . . . no ordinary fallible criminal defense attorney would have concluded . . . would be to the defendant's advantage to adopt."

As noted earlier, see note 23, *supra*, trial counsel's performance must be judged by the standards of the time and not by today's standards. The Commonwealth advances a view that simply disregards the reality of the times. In 1984, when the trial occurred, private consensual homosexual sex was criminalized in many States, and homosexuality, particularly male homosexuality, often described as a "crime against nature," was routinely linked with criminality, child molestation, indecency, deviance, pathology, uncontrolled urges, moral turpitude, and pedophilia. See, e.g., *Boutilier* v. *Immigration & Naturalization Serv.*, 387 U.S. 118, 122 (1967); *Bowers* v. *Hardwick*, 478 U.S. 186, 196 (1986) (Burger, C.J., concurring) ("Condemnation of [homosexual] practices is firmly rooted in Judeao-Christian moral and ethical standards"). See also *United States* v. *Ham*, 998 F.2d 1247, 1252 & n.6 (4th Cir. 1993); *Guam* v. *Shymanovitz*, 157 F.3d 1154, 1160-1161 (9th Cir. 1998); *State* v. *Bates*, 507 N.W.2d 847, 852 (Minn. Ct. App. 1993). Compare *Lawrence* v. *Texas*, 539 U.S. 558, 578 (2003) ("The petitioners are entitled to respect for their private lives. The State cannot demean their existence or control their destiny by making their private sexual conduct a crime"); *Goodridge* v. *Department of Pub. Health*, 440 Mass. 309, 349 (2003) (Greaney, J., concurring) ("The plaintiffs are

have it treated to get rid of it and three days is adequate time. We know that from the medical testimony. But don't stop there. If he had it at any point before October 6 he would have gotten rid of it the next day. It's entirely consistent for him to have had it when he abused [Boy A] and the next time he had access to a child, for him to have gotten rid of it. It's perfectly consistent and perfectly logical to consider.

"Remember Dr. Ross told you that people who have had it once before have a greater chance of getting it a second time by virtue of their life style. You recall Bernard Baran's own testimony that when he was fourteen or fifteen he had venereal disease. What does that tell you? That tells you why [Boy A] had gonorrhea in his throat. Poor little boy."

members of our community, our neighbors, our coworkers, our friends. . . . We share a common humanity and participate together in the social contract that is the foundation of our Commonwealth").

It is also well to remember that it was in the 1980's that alarming information as to the HIV/AIDS epidemic emerged. At the time, this devastating disease affected primarily gay men and caused considerable panic in the general population. Not yet treatable and its transmission not well understood, the disease was greatly feared and those who contracted it faced ostracism. See, e.g., *Commonwealth* v. *Martin,* 39 Mass. App. Ct. 658, 663 (1996), *S.C.,* 424 Mass. 301 (1997), quoting from *Raytheon Co.* v. *Fair Employment & Hous. Commn.,* 212 Cal. App. 3d 1242, 1252 (1989) ("The 'devastating effects of [AIDS] and widespread lack of knowledge about it have produced deep anxieties, and considerable hysteria, about the disease and those that suffer from it' "). See also *Commonwealth* v. *Martin,* 424 Mass. at 305 ("the widespread ignorance about the nature of this disease and the accompanying prejudices against persons suffering from it or . . . merely alleged to suffer from it, pose dangers to the accuracy and fairness of the legal process"). Without having otherwise properly prepared for a trial where very small children would testify to unspeakable acts, it was in this larger context that trial counsel made his decision to identify Baran's sexual orientation and not to contest evidence as to gonorrhea, another sexually transmitted disease. By doing so, he facilitated the speculative, stereotypical, and deeply insidious links between homosexuality, gonorrhea, and child molestation.

We understand the argument that it was reasonable for trial counsel to have raised preemptively the subject of Baran's sexual orientation, allowing counsel some control over the information and permitting him both to filter out biased prospective jurors (see note 10, *supra*) and to raise parental and communal homophobia as the reason for the charges brought against Baran. Had trial counsel vigilantly excluded the gonorrhea evidence, and had he taken steps to equip himself for cross-examination with impeachment tools and expert witnesses, the reasonableness of that approach — while terribly risky given the times and the numerous child molestation charges — might be a closer question. But

that was not trial counsel's strategy and the question is not a close one: in the circumstances and in the context of the entire trial, the strategy implemented was manifestly unreasonable and would not have been adopted by an ordinary fallible criminal defense attorney. *Commonwealth* v. *Saferian*, 366 Mass. at 96. As it was, the combined missteps with respect to the explosive topics of gonorrhea and the defendant's homosexuality, compounding the already significant prejudice that either alone would cause, likely had a material effect on the jury and gave rise to a substantial risk that justice miscarried.

4. *Failure to object to fresh complaint evidence.* On direct appeal, appellate counsel claimed error in the admission of fresh complaint testimony from too many witnesses. We held in 1986:

> "Proper instructions on the limited use to which fresh complaint evidence could be put were given at the conclusion of the testimony of the first fresh complaint witness, and the jury were reminded of those instructions on several occasions in the course of the Commonwealth's case. The instructions were repeated in the charge. The testimony complained of assumed particular relevance when considered in light of the various attempts by the defendant's trial counsel to insinuate by questioning and argument that the testimony of the victims had been influenced by parents, social workers and members of the prosecution team. The cases decided in the wake of *Commonwealth* v. *Bailey*, 370 Mass. 388, 391-397 (1976), do not support the notion that fresh complaint evidence should be excluded in cases such as the present."

*Commonwealth* v. *Baran*, 21 Mass. App. Ct. at 991. While mindful of this, the motion judge nonetheless concluded that trial counsel had failed, in numerous respects, to protect Baran from improper fresh complaint evidence. To the extent that he faulted trial counsel for not requesting contemporaneous limiting instructions with respect to each witness, given this court's decision and others of the time, we do not share the motion judge's view.

We take a different view, however, with respect to counsel's failure to make efforts to limit the scope of the fresh complaint

evidence. As the court stated in *Commonwealth* v. *Bailey*, 370 Mass. at 396:

> "[A defendant] is entitled to have it impressed on the jury that the [fresh complaint] testimony may be used for corroborative purposes only; it cannot be used as hearsay to fill gaps in the prosecution's case. Usually it will be merely repetitive of the victim's testimony at the trial . . ." (footnote omitted).

Notwithstanding this principle, DSS investigator Palumbo, who provided fresh complaint evidence for Boys C and D, and the father of Boy D, for example, testified to additional acts allegedly committed by the defendant, and not described by the complainants, and were permitted to testify to other occasions, not described by the complainants, on which the defendant allegedly committed sexual assaults. Such gap-filling fresh complaint testimony was a powerful credibility enhancing device, yet trial counsel did little to protect his client from it. Had trial counsel been attentive and minimally well-prepared, he should have detected these embellishments and lodged appropriate objections. There was no discernible advantage to the defendant in refraining from objection. His failure to do so, together with his failure to object to the judge's erroneous and incomplete instructions on fresh complaint,[42] was attorney error, as was appellate counsel's failure to raise the points on appeal. Particularly when considered in light of the errors already discussed *supra*, this error contributed to the creation of a substantial risk that justice miscarried.

5. *Failure to insist on indictment.* The defendant was not formally charged with respect to Boy C until the first day of

---

[42]Trial counsel also erred in failing to object to the judge's instructions on fresh complaint testimony. At the time of trial, the law required a trial judge to instruct that, in order for fresh complaint testimony to be considered for corroborative purposes, the jury must find that a complaint was, in fact, fresh. See *Commonwealth* v. *Sherry*, 386 Mass. 682, 690-691 (1982). The trial judge here, rather than stating that a complaint must be made "reasonably promptly," see *id.* at 691, or using some other approved formulation, instead stated cryptically — and only during his preliminary instructions on the topic — that the complaint must be received "during a certain period of time." His final charge omitted any reference to the timeliness requirement altogether. This was an important omission, and one that should have caught the attention of trial and appellate counsel.

trial.[43] Notwithstanding the seriousness of the charges as to Boy C, trial counsel agreed to waive the defendant's right to an indictment, stating his belief that it "was the practical thing to do," and obtained a written waiver from the defendant. Compare *Commonwealth* v. *McCarthy*, 385 Mass. 160, 163 & n.6 (1982) ("A grand jury finding of probable cause is necessary if indictments are to fulfil their traditional function as an effective protection 'against unfounded criminal prosecutions.' . . . 'The right of individual citizens to be secure from an open and public accusation of crime and from the trouble, expense and anxiety of public trial, before a probable cause is established by the presentment and indictment of a grand jury, in case of high offences, is justly regarded as one of the securities to the innocent against hasty, malicious and oppressive public prosecutions . . . .' *Jones* v. *Robbins*, 8 Gray 329, 344 [1857]").

It is possible, nonetheless, that in some cases, waiving the right to an indictment may confer strategic advantages on a defendant. Chief among these is the opportunity to demand a preliminary hearing. In the context of such a hearing, a defendant has the opportunity to learn the details of the Commonwealth's case against him, and to cross-examine the government's witnesses, providing an invaluable opportunity for discovery. Here, inexplicably, and despite the fact that trial counsel conceded that he had "very little information" on the newly added complainant, no preliminary hearing was demanded. Moreover, counsel made no motion for a continuance to permit him additional time for discovery or preparation. Despite the fact that the newly added charges both carried the maximum penalty of life in prison (the sentence which, as to one of the charges at least, ultimately was imposed), trial counsel elected to proceed directly to trial. The defendant derived no advantage from this decision, one that epitomizes the utter lack of regard for proper preparation and zealous advocacy for the important rights of his client that characterized trial counsel's performance throughout the proceedings. His conduct in this regard amply reflects the "serious incompetency, inefficiency, or inattention" required by the *Saferian* standard, 366 Mass. at 96, to obtain relief on the basis of ineffective

---

[43]See notes 6 and 13, *supra*.

representation. See *Commonwealth* v. *Sargent*, 449 Mass. 576, 586 (2007).[44]

We reject the Commonwealth's argument that the decision to waive the right to an indictment, without seeking a meaningful quid pro quo, ultimately did not prejudice the defendant, and so cannot provide a basis for relief. Such a claim is necessarily grounded on the mistaken premise that the defendant has no claim to relief simply because his trial counsel, even if provided with the opportunity to achieve some strategic advantage for his client, would likely have squandered it due to his ineffectiveness. The standard we use, however, is an objective one, and we look to the ordinary fallible lawyer, and not to defendant's trial counsel, as our touchstone. Requiring the Commonwealth to obtain an indictment would have provided the defendant, in the ordinary course, with additional time to prepare his case; alternatively, a preliminary hearing might have provided some useful foreshadowing of the Commonwealth's trial evidence and might well have prompted inquiry as to the unedited videotapes. Even if this particular defense counsel may not have capitalized on these opportunities, it was *objectively* attorney error to have ignored them altogether. With other such errors, it created the substantial risk of a miscarriage of justice.

6. *Failure to protect the defendant's right to a public trial.* The record reflects and the parties appear to agree that, during the testimony of the children, the courtroom was closed to the public. Nothing in the record suggests that this was done upon motion of the Commonwealth or after any hearing at which the necessity of such action, or its impact on the rights of the defendant, was considered. Moreover, there is no evidence that the judge's decision in this regard was supported by any written findings.[45] As a result, and as discussed more fully below, the court failed to follow the procedures delineated in both *Globe Newspaper*

---

[44]It is worth recalling that despite the large number of complainants and witnesses, the complexity of the medical and psychological evidence, and the gravity of the charges, trial counsel proceeded to trial approximately nine weeks after the defendant was indicted, a period that included the Thanksgiving, Christmas, and New Year holidays.

[45]There is nothing of record regarding the trial judge's decision to close the courtroom to the public during the testimony of the complainants. The record does reflect the fact that defense counsel objected when the trial judge proposed

*Co.* v. *Superior Ct.*, 457 U.S. 596 (1982), and *Waller* v. *Georgia*, 467 U.S. 39, 48 (1984). To the extent that trial counsel failed to take steps to protect the defendant's right to a public trial as articulated in these decisions, and to the extent that appellate counsel failed to raise the issue on direct appeal, one fully developed at the time of trial, the motion judge found, and we agree, that they were fatally remiss.

7. *Summary, ineffective assistance.* Many of the individual errors identified above would, standing alone, likely provide a sufficient independent basis for granting the defendant a new trial. In particular, defense counsel's apparent failure to engage in any meaningful preparation for what was indisputably a complex, high-stakes trial represented a more or less complete abandonment of his professional obligations to the defendant. While trial counsel may have had some good ideas, he failed utterly in developing and implementing them. The strategic choices trial counsel made were not informed choices, made after investigation of the law and facts. His inability to undermine the credibility of the Commonwealth's witnesses speaks both to his lack of preparation and his quite limited trial skills. Ultimately all these factors converged, resulting in cascading and pervasive error, with zealous advocacy yielding to acquiescence and accommodation. In the end, we need not consider whether any single instance of nonfeasance meets the standard required to obtain a new trial on the basis of attorney error. It is enough to say that, in the aggregate, trial counsel's performance, followed by appellate counsel's, unquestionably fell below the minimum constitutional requirements imposed by art. 12 of the Massachusetts Declaration of Rights and the Sixth Amendment to the United States Constitution, and that "better work might have accomplished something material for the defense." *Commonwealth* v. *Satterfield*, 373 Mass. at 115.[46] See *Commonwealth* v. *Garcia*, 66 Mass.

partitioning the courtroom during the complainants' testimony such that neither the defendant nor the jury would be able to observe the complainants directly while they were in the witness box. However, the record also indicates that on at least two occasions when the judge ordered the courtroom closed, defense counsel lodged no contemporaneous objection.

[46]This may, in fact, be one of those rare cases "where the defense was so botched," *Commonwealth* v. *Satterfield*, 373 Mass. at 115, that it is unnecessary even to inquire closely whether and in what manner precisely a better effort "might have accomplished something material for the defense." *Ibid.*

App. Ct. 167 (2006). To the extent that the standard of review is whether counsel's errors gave rise to a substantial risk of a miscarriage of justice, we are satisfied that the errors prejudiced Baran, materially influenced the verdict, and were not reasonable tactical decisions. The motion judge did not abuse his discretion in allowing the defendant's motion for a new trial based on the ineffective assistance of counsel.

C. *Other issues.* 1. *Public trial.* As already noted, the trial judge closed the courtroom to the press and public during the most crucial phase of the trial proceedings, the testimony of the child complainants. He did so without making any findings to warrant the closure. At the time of trial, the right to a public trial was well established as a matter of Federal constitutional law. Irrespective of whether counsel rendered ineffective assistance in this regard, the motion judge was also warranted, on this independent basis, in granting the defendant a new trial.

In *Globe Newspaper Co.* v. *Superior Ct.*, 457 U.S. 596 (1982), involving the testimony of minor victims of sexual offenses, the Supreme Court determined that, notwithstanding a State statute mandating closure, the First Amendment to the United States Constitution requires courts to consider on a case-by-case basis whether closure of a courtroom to the public, including the press, is warranted, with a strong presumption in favor of a public trial. As the Court observed: "[T]he State's justification in denying access [to the public] must be a weighty one. Where . . . the State attempts to deny the right of access in order to inhibit the disclosure of sensitive information, it must be shown that the denial is necessitated by a compelling governmental interest, and is narrowly tailored to serve that interest." 457 U.S. at 606-607.

Applying similar principles, the Supreme Court in *Press-Enterprise Co.* v. *Superior Ct. of Cal.*, 464 U.S. 501 (1984), concluded that a trial judge had erred in closing jury voir dire proceedings to the public and in sealing the transcripts of same.[47] A few months after *Press-Enterprise* was decided, the Supreme

---

[47]In particular, the *Press-Enterprise* Court faulted the trial judge for failing to disclose the basis for his decision and for failing to consider less restrictive options. In reversing the judge's impoundment order, the Court stated: "[a]ssuming that some jurors had protectible privacy interests in some of their

Court revisited the question of the right to a public trial in *Waller* v. *Georgia*, 467 U.S. 39 (1984). However, unlike *Globe Newspaper* and *Press-Enterprise*, both of which focused on the First Amendment, the Court in *Waller* considered instead the public trial rights conferred by the Sixth Amendment.

The *Waller* Court began its analysis by adverting to these earlier First Amendment cases and observing: "[T]here can be little doubt that the explicit Sixth Amendment right of the accused is no less protective of a public trial than the implicit First Amendment right of the press and public." 467 U.S. at 46. The Court then set out a four-part test for determining when proceedings may be closed to the public consistent with the Sixth Amendment: "[T]he party seeking to close [a] hearing must advance an overriding interest that is likely to be prejudiced, the closure must be no broader than necessary to protect that interest, the trial court must consider reasonable alternatives to closing the proceeding, and it must make findings adequate to support the closure." *Id.* at 48. After finding that "the State's proffer was not specific as to [the potential harm created by an open hearing], . . . the trial court's findings were broad and general, . . . [and t]he court did not consider alternatives to . . . closure of the entire hearing," the Supreme Court ordered a new hearing in *Waller*.[48] *Ibid.*

In the present case, nothing of record establishes that any of the prophylactic procedures mandated by the First and Sixth Amendments, as articulated in the Supreme Court decisions just described, were followed. Specifically, there is nothing in the record indicating what specific harm — what "overriding interest that is likely to be prejudiced," *ibid.* — was avoided through closure of the trial,[49] and no suggestion that interested parties, including the press, had the "opportunity to be heard on the

---

answers, the trial judge provided no explanation as to why his broad order denying access to information at the voir dire was not limited to information that was actually sensitive and deserving of privacy protection. Nor did he consider whether he could disclose the substance of the sensitive answers while preserving the anonymity of the jurors involved." 464 U.S. at 513.

[48]*Waller* involved a pretrial hearing. The right to a public trial inheres even more strongly in the context of regular trial proceedings, and *Waller* has been so construed. See *Commonwealth* v. *Martin*, 417 Mass. 187, 193-194 (1994). Compare *Commonwealth* v. *Martin*, 39 Mass. App. Ct. 44, 47-49 (1995).

[49]During a side bar colloquy during which the trial judge discussed with

question of their exclusion." *Globe Newspaper*, 457 U.S. at 609 n.25 (citation omitted). Moreover, there is no dispute that the trial judge made no record "findings adequate to support the closure." *Press-Enterprise*, 464 U.S. at 511. Indeed, as we have noted, there were no findings whatsoever. "The presumption of openness may be overcome only by an overriding interest *based on findings* that closure is essential to preserve higher values and is narrowly tailored to serve that interest. The interest is to be articulated *along with findings specific enough that a reviewing court can determine whether the closure order was properly entered*" (emphasis added). *Id.* at 510. We are unable to undertake such an inquiry here and, in these circumstances, conclude that the defendant's Federal constitutional right to a public trial, as this right was defined at the time of trial, was violated.

"Generally, the appropriate relief for violations of the constitutional right to a public trial is a new trial." *Commonwealth v. Martin*, 417 Mass. 187, 196 (1994), citing *Waller v. Georgia*, 467 U.S. at 49. A violation of the defendant's right to a public trial is a structural error and not susceptible to harmless error analysis. See *Waller v. Georgia, supra* at 49 n.9 ("The parties do not question the consistent view of the lower federal courts that the defendant should not be required to prove specific prejudice in order to obtain relief for a violation of the public-trial guarantee. We agree with that view"); *Commonwealth v. Patry*, 48 Mass. App. Ct. 470, 476 (2000) (same). Thus, "once a petitioner demonstrates a violation of his Sixth Amendment right to a public trial, he need not show that the violation prejudiced him in any way. The mere demonstration that his right to a public trial was violated entitles a petitioner to relief." *Owens v. United States*,

counsel a proposal to partition the courtroom during the complainants' testimony, the judge never indicated that he had any specific or serious concerns about their ability to testify in open court. Rather, the judge indicated that the children "may not feel comfortable" in the courtroom as ordinarily configured. Apart from the fact that the judge cited no basis for his assessment, such mild, general concerns would hardly amount to the sort of "compelling interest" required to justify closure. Indeed, in the context of minor sexual assault victims, the requisite compelling interest has been defined as "a significant risk of psychological harm or trauma." *Commonwealth v. Martin*, 417 Mass. at 194. Based on the judge's statements, such a risk does not appear to have been present here. Contrast *Commonwealth v. Amirault*, 404 Mass. 221, 241 (1989).

483 F.3d 48, 63 (1st Cir. 2007), quoting from *Judd* v. *Haley*, 250 F.3d 1308, 1315 (11th Cir. 2001).[50]

Our conclusion in this regard is bolstered by the fact that the judge closed the courtroom during the most crucial phase of the trial proceedings, the testimony of the child complainants. The evidence provided by the children represented the core of the Commonwealth's case against the defendant, constituting as it did the only direct evidence of his guilt. The policy interests underlying the right to a public trial include the opportunity that open hearings provide for "scrutiny of the judicial process" and the tendency for public proceedings to "discourage[] false testimony." *Commonwealth* v. *Martin*, 417 Mass. at 192-193. These considerations had especial application in the particular circumstances of this case. The judgments cannot stand.

2. *Prosecutorial misconduct.* The motion judge did not address the defendant's contention that prosecutorial misconduct independently warranted a new trial, see *Commonwealth* v. *Smith*, 387 Mass. at 912, and made few findings relevant to the issue. In his motion, the defendant had called attention to prosecutorial vouching for government witnesses, improper closing argument, the failure to disclose significant exculpatory evidence in the government's possession, and intentionally presenting false and misleading evidence to the grand jury. Notwithstanding the absence of findings, the record provides support for certain of these contentions, as we have already noted in our discussion of vouching and improper argument. The record is less clear on the remaining points, though nonetheless troubling in certain respects.

---

[50]We note further that, while the right to a public trial is one that may be waived, the Commonwealth did not make this argument on appeal. In any event, based on the evidence before us, and consistent with the findings of the motion judge, who heard testimony from the defendant and his mother on this point, we conclude that no waiver was tendered. Moreover, we find troubling the Commonwealth's suggestion that the absence of findings should somehow preclude a determination that the defendant's Federal constitutional rights were violated. In the first instance, as noted above, the absence of findings, in and of itself, violates the constitutionally mandated procedures set out in these cases. Moreover, the record provides at least some basis for drawing conclusions as to the judge's assessment of the complainants' mental state. See note 49, *supra.* Finally — and most important — a closed trial is presumptively unlawful, see *Commonwealth* v. *Marshall*, 356 Mass. 432, 435 (1969), and constitutes error per se in the absence of an affirmative showing that closure of the type here comports with applicable procedural safeguards.

While the record does not settle the question whether the unedited videotapes were deliberately withheld by the prosecution, there are indications in the trial transcript consistent with that contention, e.g., the trial prosecutor's provision, after trial was underway, of edited rather than unedited tapes of Boy C's interview as well as the prosecutor's recognition that what trial counsel had in his possession and reviewed during trial were the edited videotapes.[51] The unedited tapes, evaluated in the context of the entire record, are exculpatory and material insofar as they "create[] a reasonable doubt that did not otherwise exist." *Commonwealth* v. *Jackson*, 388 Mass. 98, 110 (1983), quoting from *United States* v. *Agurs*, 427 U.S. 97, 112 (1976). See *Brady* v. *Maryland*, 373 U.S. 83 (1963). The unedited tapes reveal significant vacillation and uncertainty on the part of many, if not all, of the children interviewed, as well as considerable material from which it could be inferred that the children's testimony was coached. Particularly powerful are the numerous instances in which various complainants deny that the defendant had engaged in any misconduct. At a minimum, these tapes would have provided significant grist for impeachment of the children's testimony as well as of those who had interviewed them.

Also troubling in this regard is the prosecutor's apparent failure to produce various police reports and other materials that, among other things, might have supported the inference that one or more of the complainants had been sexually abused by another —

---

[51]The process of obtaining the unedited videotapes posttrial was long and arduous. Motion counsel's efforts to obtain the unedited videotapes were documented by the motion judge. Motion counsel first requested the unedited tapes on December 4, 2000. A year later, an interim order entered requiring the Commonwealth to file within one month certificates as to the existence of the tapes or any objections to their production. After three extensions requested by the Commonwealth, and a hearing before the motion judge, a second interim order entered on October 25, 2001, which, inter alia, directed counsel to confer and to draft a protective order. The motion judge noted that "there was delay in obtaining the agreement of the Commonwealth to the protective order," which was submitted to court on April 4, 2002. Although by that time three tapes had been located (two of which were edited grand jury tapes), they were not sent to the defendant until a further order issued from the court on July 23, 2004. At a subsequent discovery hearing on September 17, 2004, the prosecutor reported that he had found five unedited tapes in a box of old "DUI" tapes, and delivered them to the defendant.

evidence that might have been used either for impeachment or to rebut allegations of age-inappropriate sexual knowledge.[52] See generally *Banks* v. *Dretke*, 540 U.S. 668, 696 (2004) ("A rule . . . declaring 'prosecutor may hide, defendant must seek,' is not tenable in a system constitutionally bound to accord defendants due process").

As to the grand jury presentment, the motion judge found that only a composite videotape, containing edited versions of the interviews, was shown to the grand jury. Our review of the composite tape and comparison of it to the unedited counterparts reveals a somewhat distorted portrayal of the children's allegations, the composite tape omitting significant exculpatory content. As the motion judge stated in his memorandum and order:

> "All [of] the edited versions [shown to the grand jury] omit statements of denial and statements indicative of suggestiveness . . . . The unedited versions [of the videotapes] contain statements in which the children deny that Mr. Baran had done anything to them and statements where they accuse other persons of abuse. They also contain[] statements which accuse[] other people of witnessing these alleged acts — evidence which counsel could have used to . . . [challenge] the veracity of the allegations."

The motion judge offered numerous illustrative examples culled

[52]As previously discussed, see notes 22, 24, and 31, *supra*, there was evidence as to Girl E that the Commonwealth failed to disclose regarding her abuse by her mother's boyfriend, "Chino." Detective McGuire of the Pittsfield police department, who testified at trial, knew as of October 13, 1984, that Girl E had disclosed to Dr. Sheeley that day not only molestation by the defendant but also earlier molestation of the same kind by her mother's boyfriend at the time, Chino. The same day, October 13, the detective took statements from Girl E and Mother E about the defendant which, however, did not mention the Chino disclosures (these statements were later produced to trial counsel). Also on October 13, the detective reported to DSS the allegation that, in early July, 1984, at a West Springfield motel, Chino had orally raped the girl and touched her genitalia. DSS later substantiated this 51A report and referred the matter to the district attorney on October 18, 1984. Neither the 51A and 51B reports nor the referral for prosecution as to Chino were provided to trial counsel. Nor was trial counsel provided a copy of Detective McGuire's November 7, 1984, letter to a sergeant in the West Springfield police department detailing Girl E's disclosures about Chino. As to evidence that Boy A had been abused by his mother's boyfriend, see notes 11 and 39, *supra*.

from the transcripts of the unedited videotapes, including the following excerpt from the interview with Boy A,[53] which was omitted from the grand jury version:

> Q.: "[C]ould [you] tell me a little bit more about what Bernie did to you."
>
> A.: "He didn't do nothing."
>
> Q.: "Yeah. I know, you showed me. You showed me where he pulled down your pee pee stick."
>
> A.: "He didn't now."
>
> Q.: "He didn't do it now, though. Did he, did he do it more than one time, do you know?"
>
> A.: "No."
>
> FATHER: "No, you're a good kid. So can you tell her if Bernie said anything, or if you said anything?"
>
> A.: "I don't know."
>
> Q.: "You don't know. Okay. Maybe you'll remember some other time and you can tell me. Maybe you don't remember right now. Maybe it will come back to you, what Bernie said to you. When you went to the doctor yesterday, was your pee pee okay?"
>
> A.: "Yup."

The motion judge also provided this example from Boy D's interview, which was likewise omitted from the grand jury version:

> Q.: "Okay. We were talking about when you went to ECDC, right [boy nods yes], do you remember when you were there a long time ago [boy nods yes], do you remember

---

[53]As we have noted, the case against Baran began with the A family's allegations. The excerpts from the unedited videotapes of Boy A's interview foreshadow his testimony at trial where, as the motion judge noted, "Due to Boy A being unable to testify to criminal acts alleged to have been committed upon him, the court allowed a required finding of not guilty [on] the two counts in which he [was] the complainant."

being touched with bad touch? [Boy nods yes.] Yeah? Who touched you [i]n a bad touch way?"

*A.*: "[A classmate]."

*Q.*: "[Your classmate] did? Do you remember any big people, adult people who touched [another classmate] in a bad way that made him feel kind of funny inside, like that person shouldn't do that to me?"

*A.*: "Mary."

*Q.*: "Are you sure it was Mary? [Boy nods yes.] Yeah?"

These examples, as well as others cited by the motion judge, appear typical of the type of material omitted from the composite videotape presented to the grand jury. Compare *Commonwealth v. Fleury*, 417 Mass. 810, 817 (1994).

The defendant also points to evidence (see notes 21 and 24, *supra*) that the trial prosecutor, before trial, turned over certain material from his case files to the law firm representing Girl E and her mother, the same law firm that later represented Baran on direct appeal.

Motion counsel raised the issue of prosecutorial misconduct as both an independent basis for a new trial and a sufficient basis to dismiss the charges with prejudice. See, e.g., *Commonwealth v. Tabor*, 376 Mass. 811, 819-820 (1978) ("A prosecuting attorney's obligation is to secure a fair and impartial trial for the public and for the defendant. His obligation to the defendant in this regard is as great as is his obligation to the public. The district attorney is vital to the administration of justice and to the vindication of constitutional rights"). Compare *Commonwealth v. McCarthy*, 385 Mass. 160 (1982). Cf. *Commonwealth v. Manning*, 373 Mass. 438 (1977); *Commonwealth v. Cinelli*, 389 Mass. 197, 210, cert. denied, 464 U.S. 860 (1983); *Donavan v. Commonwealth*, 426 Mass. 13, 15 (1997). While preserving the issue on appeal, motion counsel nonetheless pressed only to retain the remedy the motion judge had awarded; no other remedy is warranted on the present record. See *Commonwealth v. Merry*, 453 Mass. 653, 665-666 (2009) ("delineat[ing] limited circumstances for dismiss-

ing a complaint due to prosecutorial misconduct: . . . if the governmental conduct resulted in such irremediable harm that a fair trial . . . is no longer possible . . . ; [or] where the prosecutor's conduct is otherwise so egregious that dismissal is warranted to deter similar future misconduct" [citations omitted]). Given that the motion judge is no longer on the Superior Court bench, that two other independent bases warrant the allowance of a new trial, and that it is unclear whether a retrial will be sought, we conclude that a remand at this time for further evidentiary hearings and findings would not serve the interests of judicial economy.[54]

IV. *Conclusion.* We do not lightly affirm the order granting a new trial. For that reason, we have painstakingly examined the record, the motion judge's decision, and the legal issues on which it is based. The charged offenses are grave and we are mindful that the passage of so much time will impose heavy burdens on all concerned in the event of a retrial.[55] At the same time, it cannot be said that the defendant received anything close to a fair trial. Preserving public confidence in the integrity of our system of justice must be our paramount concern notwithstanding the costs our decision today might occasion. "Our desire for finality should not eclipse our concern that in our courts justice not miscarry." *Commonwealth* v. *Amirault,* 424 Mass. at 660 (O'Connor, J., dissenting).

---

[54]Nothing we have said should be understood as precluding the defendant from bringing a motion seeking to dismiss the indictments pursuant to *Commonwealth* v. *Merry, supra.*

[55]Although the defendant did not bring his motion for new trial until eighteen years after his direct appeal was decided, we note that the passage of time "does not invalidate such motion." *Commonwealth* v. *Wheeler,* 52 Mass. App. Ct. 631, 636 (2001), citing *Commonwealth* v. *Francis,* 411 Mass. 579, 585-586 (1992). Nor has the Commonwealth argued that the delay was deliberate or strategic. Contrast *Commonwealth* v. *Francis, supra* at 585. The filing of the motion was preceded by four years of what the motion judge described as "an intensive effort on the part of defense counsel . . . to obtain discovery . . . some of which had been . . . kept in the custody of the clerk and others likely kept, if at all, in the possession of the Commonwealth." Given the evidence of appellate counsel's conflict of interest (see, e.g., note 24, *supra*), and other circumstances discussed earlier, such as the apparent withholding of DSS and police reports (see, e.g., note 52, *supra*), and the delay in producing the unedited videotapes (see note 51, *supra*), consequences attendant to the delay in bringing the new trial motion cannot be attributed to the defendant. Contrast *Commonwealth* v. *Wheeler, supra* at 640 n.12.

The motion judge did not abuse his discretion in granting the defendant a new trial and vacating the convictions and sentences.

*Order allowing motion for
new trial affirmed.*

*Judgments reversed.*

*Verdicts set aside.*